IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JENNIFER DEEGAN,                       )
                                       )
         Plaintiff,                    )
                                       )
v.                                     )
                                       )          Case No. 7:16-cv-00260
MELANIE MOORE,                         )
CAROLE GRAHAM, and                     )
LORI BAKER,                            )
                                       )
         Defendants.                   )

**MEMORANDUM OPINION**

Plaintiff Jennifer Deegan, a former nursing student at Virginia Western Community

College (VWCC), brings this First Amendment retaliation claim against VWCC administrators

Melanie Moore, Carole Graham, and Lori Baker (collectively defendants), alleging that they

retaliated against her for making statements critical of the nursing program.  Defendants now

move to dismiss, arguing that Deegan fails to state a claim upon which relief can be granted and

that they are entitled to qualified immunity.  (Dkt. Nos. 4, 6.)  The motions were fully briefed

and were argued before the court on September 30, 2016.  For the reasons set forth below, the

court will grant Moore's motion and deny Graham and Baker's motion.

I.   BACKGROUND

**A.  Deegan's Allegations**

The facts recited in this section and relied on below are based on the allegations of

Deegan's complaint.  (Dkt. No. 1.)  As it must for purposes of defendants' motions to dismiss,

the court accepts Deegan's allegations as true and construes them in the light most favorable to

Case 7:16-cv-00260-EKD   Document 35   Filed 03/30/17   Page 1 of 20   Pageid#: 188

her.  *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 189 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012).

This case arises from Deegan's criticism of and resignation from VWCC's nursing program.  Deegan enrolled in the program in fall 2013 and grew concerned about its quality the following spring when an unqualified instructor replaced a qualified instructor who had resigned. (Compl. ¶ 11.)  At some point, apparently around spring 2014, Deegan discussed her concerns with some unnamed nursing program instructors who agreed that the program's quality of instruction was lacking.  (*Id.*)

Deegan's concerns grew when she returned for class in August 2014.  (*Id.* ¶ 13.)  Two more qualified instructors had resigned over the summer, and the program continued to decline. (*Id.* ¶¶ 12, 13.)  Melanie Moore (the Assistant Dean of Nursing) and other instructors quizzed students on materials they had not learned the previous year and criticized the quality of the program.  (*Id.* ¶¶ 5, 13.)  However, despite Moore's criticism of the nursing program, she refused to discuss declining licensure scores with a student who tried to raise the issue during a class. (*Id.* ¶ 13.)  Unnamed instructors also told students that the program would try to get rid of uncooperative students.  (*Id.*)

Around the end of August, Deegan voiced her frustrations to various members of the VWCC community.  On August 27, 2014, she contacted VWCC's Board of Trustees by letter about her concerns, and told them that she would be willing to meet with VWCC's President Dr. Robert Sandel to discuss them.  (*Id.* ¶ 14.)  The following day, she complained about the pop quizzes and lack of instruction during a Nursing 238 class.  (*Id.* ¶ 16.)  Deegan alleges that her comments in that class were recorded and were not disruptive—apparently, they were made during a group discussion of the subject with many members of the class.  (*Id.* ¶¶ 16, 20.)  After

class, Deegan met with defendant Graham, the Dean of Health Professions, to discuss her concerns further, and then scheduled a meeting with Sandel, Graham, Moore, and VWCC's Vice President Elizabeth Wilmer for September 3, 2014. (*Id.* ¶¶ 6, 18.)

After Deegan's comments in the Nursing 238 class, defendants "caused or encouraged" the filing of a student misconduct report charging her with disruption and verbal abuse.[1] (*Id.* ¶ 20.) Dean Graham and defendant Lori Baker, the Dean of Student Services, told her about the charge in the September 3, 2014 meeting, which Sandel, Wilmer, and Moore did not attend. (*Id.* ¶ 19.) The next day, Deegan received a letter from Baker confirming that she had been charged with misconduct and informing her that there would be a hearing before the Student Misconduct Committee to address the charges. (*Id.* ¶ 20.)

On September 9, 2014, Deegan filed a grievance outlining her problems with the nursing program. (*Id.* ¶ 22.) She claimed, among other things, that teachers were bullying nursing students and that student concerns were met with hostility, threats, and disciplinary action. (*Id.*) After a meeting with Wilmer on September 22, 2014, Deegan's grievance was determined to be unfounded. (*Id.* ¶ 23.)

Deegan met with Baker about the misconduct charge on September 29, 2014. (*Id.* ¶ 24.) Baker did not meet with Deegan until Deegan requested the meeting directly, although Baker's investigation into the charge should have included a meeting, and Baker refused to listen to a recording of the Nursing 238 class that Deegan brought with her. (*Id.* ¶ 24.) At some point, apparently after that meeting but prior to her misconduct hearing, Deegan resigned from the nursing program. (*Id.* ¶ 26.) Despite her resignation, she still attended the hearing on October

---

[1] Deegan's complaint includes the following description of the charges: "Disruption: Disruption of a classroom, laboratory, library, office, hallway, public student space, such as the student center, meeting or hearing; and Verbal Abuse: When the student utters obscene words or engages in verbal abuse that continues [sic] harassment of others." (Compl. ¶ 20.)

3

15, 2014, and was cleared of the misconduct charges by the Student Misconduct Committee. (*Id.* ¶ 25.)

Deegan filed this First Amendment retaliation claim against Moore, Graham, and Baker, alleging that her criticism of VWCC's nursing program was protected speech and that defendants retaliated against her by filing the student misconduct charge. Defendants move to dismiss, arguing that Deegan failed to state viable claims against them and that they are entitled to qualified immunity.

## B. Additional Documents

As exhibits to their motion to dismiss, defendants included a copy of the September 4, 2014 letter informing Deegan of the charge against her, and a copy of the incident report on which defendants claim the misconduct charge was based. (Def.'s Br. Supp. Mot. Dismiss (Def.'s Br.) Ex. 1, Dkt. No. 5-1.) The second page of the incident report is a typed, unsigned paragraph apparently describing the professor's account of the August 28, 2014 Nursing 238 class. The paragraph states that following a quiz on that date, Deegan stood up and expressed her displeasure about the quiz's content and preparation time "in a loud and disrespectful manner" and that her conduct was "alarming and disruptive to the class as a whole." (*Id.*)

With her brief in opposition (Dkt. No. 9), Deegan submitted a copy of the grievance she filed after she was charged with misconduct (Pl.'s Br. Opp'n Ex. 1) and a copy of VWCC's student conduct policy. (*Id.* at Ex. 2.) Deegan relies on these documents for several points. First, she claims that the grievance shows that she discussed her concerns about the nursing program with Moore during summer 2014. Second, she claims that under the terms of the misconduct policy, she should have had a meeting with defendants Graham and Baker "prior to the imposition of the misconduct charge." (Pl.'s Br. Opp'n 4.)

4

## II.  DISCUSSION

### A.  Motion to Dismiss Standard

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a plaintiff's complaint to determine whether the plaintiff has properly stated a claim.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  To avoid dismissal, the "complaint must establish 'facial plausibility' by pleading 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Basically, a plaintiff must "nudge[] [her] claims across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In determining whether a plaintiff has met this plausibility standard, the court must take as true all well-pleaded facts in the complaint and in any documents incorporated into or attached to the complaint.  *Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards*, 178 F.3d at 244, but it "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'"  *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

### B.  The Court Will Not Consider Additional Documents

Although this case is before the court on a motion to dismiss pursuant to Rule 12(b)(6), both parties rely on documents outside the complaint in support of their arguments. Accordingly, the court must first decide what documents it may consider and which allegations of those documents it must accept as true.

5

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of the allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). District courts have discretion "to determine whether or not to 'exclude' matters outside the pleadings." *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 996 (4th Cir. 1997). Usually, when "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *Zak,* 780 F.3d at 606.

Under limited circumstances, courts may consider additional documents that are not incorporated into the complaint or attached as exhibits without converting the motion into a motion for summary judgment. This may occur only if the documents are "integral to the complaint and there is no dispute about [their] authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); *Zak*, 780 F.3d at 606–07; *Trimble Nav.*, 484 F.3d at 705; *Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 234 (4th Cir. 2004). An integral document is one "that by its very existence, and *not the mere information it contains*, gives rise to the legal rights asserted." *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in original) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)); see *also Goines*, 822 F.3d at 168 ("Goines does not base his claims on the Incident Report—that is, no portion of any of his claims is dependent upon the truth of any statement in the Incident Report."). When a plaintiff relies on a document "for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Goines*, 822 F.3d at 167.

6

Because defendants' exhibits do not fall within the scope of documents properly considered when ruling on a Rule 12(b)(6) motion, the court will not consider them here. First, the incident report is neither integral to the complaint nor is its authenticity uncontested. Deegan's complaint does not mention the incident report, and her claim does not depend on the truth of the statements in the report—in fact, her theory is that those statements were false. (*See* Compl. ¶ 16.) Furthermore, Deegan apparently disputes the report's authenticity: she notes that the relevant page "contains no date, identification, signature or reference," and is "unreliable as [it] bear[s] no indication as to when or by whom [it] was prepared." (Pl.'s Br. Opp'n 7.) Thus, the court will not consider the incident report.

Second, the letter informing Deegan that she had been charged with misconduct is also not integral to the complaint. Although the complaint mentions the letter, it does not incorporate it by reference. Moreover, the letter's "existence did not create the legal right[] asserted," *Walker*, 517 F. Supp. 2d at 806, and it is not integral to the complaint. *Goines*, 822 F.3d at 166. The misconduct charge itself—not the letter informing Deegan of the charge—is the basis for Deegan's claim. At most, the letter simply gave Deegan notice that defendants filed the charge. The court will therefore exclude both documents submitted with defendants' motion.

The court will not consider Deegan's additional exhibits for similar reasons. Deegan relies on her exhibits for facts that are not alleged explicitly in the complaint: the grievance to show that she spoke with Moore during summer 2014, and the conduct policy to show that she should have had a meeting with Baker "*prior* to the imposition of the conduct charge." (Pl's Br. Opp'n 4.) "[I]t is 'well-settled that a complaint cannot be amended by the plaintiff's brief in opposition to a motion to dismiss.'" *Botkin v. Fisher*, No. 5:08-cv-58, 2009 U.S. Dist. LEXIS 24554, at *20 (W.D. Va. Mar. 25, 2009) (quoting *Bessinger v. Food Lion, Inc.*, 305 F. Supp. 2d

574, 581 (D.S.C. 2003)); *accord Adams v. Am. Fed'n of State*, 167 F. Supp. 3d 730, 736 (D. Md. 2016). Like defendants' submissions, Deegan's documents are properly considered only if they are integral to her complaint and authentic. *See Mathis v. McDonough*, No. 13-cv-2597, 2015 U.S. Dist. LEXIS 79741, at *24–25 (D. Md. June 19, 2015) (applying the same integral and authentic framework to submissions by a plaintiff); *accord Gordon v. Kohl's Dep't Stores, Inc.*, 172 F. Supp. 3d 840, 852 (E.D. Pa. 2016); *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nig.*, 265 F.R.D. 106, 123–24 (S.D.N.Y. 2010).

Because the documents submitted by Deegan are not integral to her complaint, the court will not consider them. First, Deegan's grievance has no bearing on her retaliation claim. Deegan did not file the grievance until after the defendants charged her with misconduct (Compl. ¶¶ 20, 22), and she does not claim that they retaliated against her for the grievance, so her claim in no way depends on the truth of the statements contained therein. Similarly, although Deegan's complaint mentions the conduct policy (*Id.* ¶ 24), the policy is not the basis for her claim. Although Deegan suggests that Baker should have been more proactive about meeting with Deegan during her investigation (*see id.* ¶ 24), her claim is that defendants retaliated by filing the misconduct charge—not by manipulating the investigation and hearing process provided by the policy. (*See id.* ¶ 32.) Accordingly, the conduct policy does not give rise to the legal right asserted, *see Walker*, 517 F. Supp. 2d at 806, and is not integral.

Because the additional documents are not integral to Deegan's complaint, the court will exclude them.

## C. First Amendment Retaliation

The court now turns to whether Deegan's allegations are sufficient to state a claim for First Amendment retaliation. The First Amendment, which provides that "Congress shall make

8

no law . . . abridging freedom of speech," U.S. Const. amend. I, creates both an affirmative right to speak and "the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000); *ACLU v. Wicomico Cty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993) (per curiam) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."). In order to state a cognizable claim for First Amendment retaliation, Deegan must show: (1) that her speech was protected, (2) that the alleged retaliatory action adversely affected her protected speech, and (3) a causal relationship between her speech and the retaliatory action. *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015); *Tobey v. Jones*, 706 F.3d 379, 386–87 (4th Cir. 2013); *Suarez Corp.*, 202 F.3d at 685–86.

Deegan claims that defendants filed the student misconduct charge to retaliate against her for criticizing VWCC's nursing program in the spring and fall of 2014. (*See generally* Compl.) Defendants argue that her claim fails for several reasons. First, all defendants assert that (1) Deegan's speech was not protected and (2) the claimed retaliation did not adversely affect her speech. Second, Moore argues that Deegan has failed to establish a causal relationship between her protected speech and Moore's involvement in the misconduct charge. Finally, all three defendants assert that qualified immunity bars Deegan's claims against them. The court will address these arguments in turn.

### 1. Protected Speech

The first prong of the First Amendment retaliation test asks whether the speech for which Deegan was disciplined was constitutionally protected. Defendants argue that it was not protected for two primary reasons: first, because the speech did not relate to matters of public

concern, and second, because the speech violated a neutral restriction on disrupting class. As discussed below, these arguments are unavailing.

### a. *Defendants' public concern argument fails.*

As an initial matter, defendants' position that the First Amendment protects only speech by college students on matters of public concern is unsupported by relevant case law. *See, e.g., Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'") (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)); *Connick v. Myers*, 461 U.S. 138, 147 (1983) ("We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction."). Neither the Supreme Court nor the Fourth Circuit has adopted the rule urged by defendants, and several courts have rejected it outright. *E.g.*, *Garcia v. State Univ. of N.Y. Health Scis. Ctr.*, 280 F.3d 98, 106 (2d Cir. 2001) ("SUNY correctly concedes that the public concern doctrine does not apply to student speech in the university setting . . . ."); *Guse v. Univ. of S.D.*, No. 08-4119, 2011 U.S. Dist. LEXIS 34621, at *43–45 (D.S.D. Mar. 30, 2011); *Qvyjt v. Lin*, 932 F. Supp. 1100, 1108–09 (N.D. Ill. 1996); *see also Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 766 (9th Cir. 2006) (declining to apply the public concern test to high school students).

However, even assuming that the public concern doctrine applies in the state university-student relationship, Deegan's allegations are sufficient at this stage to support her argument that

her speech touched on matters of public concern. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Columbia v. Haley*, 738 F.3d 107, 122 (4th Cir. 2013) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). Although Deegan's exact words are not alleged, some of her statements allegedly concerned the quality of education nursing students were receiving at VWCC. Those statements, which relate to the quality of public education and the training of local health care professionals, could at least plausibly touch matters of public concern. *See Bernheim v. Litt*, 79 F.3d 318, 325 (2d Cir. 1996) (noting that "statements regarding the quality of education provided by [a] public school as measured by achievement test scores and their year-to-year improvement or deterioration" could be matters of public concern). Accordingly, Deegan's allegations are sufficient to establish protected speech even if she were required to show that she spoke on matters of public concern.

### b. *The court cannot conclude that Deegan spoke in a time and place not intended for speech.*

Next, defendants argue that Deegan's speech was not protected because it was made in a place and time not intended for speech and because it disrupted class. "[T]he fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views 'whenever and however and wherever they please.'" *Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014) (quoting *United States v. Grace*, 461 U.S. 171, 177–78 (1983)). Colleges have authority to impose reasonable time, place, and manner restrictions on student speech, and if Deegan violated a neutral regulation on classroom disruption, administrators could certainly discipline her without violating her First Amendment rights. *See Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam); *Healy*, 408 U.S. at 192–93; *Sword v. Fox*, 446 F.2d 1091, 1094 n.6, 1097–98 (4th Cir. 1971); *see also Harwick v. Heyward*, 711 F.3d 426, 434 n.9 (4th Cir.

11

2013) ("*Tinker*[2] does not apply to 'a neutral time, place, and manner restriction' that a school imposes.").

However, at this stage the court cannot conclude that Deegan spoke at inappropriate times or places, or that her comments were disruptive. Deegan claims she was retaliated against for making statements critical of VWCC's nursing program on five separate occasions: (1) in conversations with program faculty in the Spring of 2014; (2) in her letter to the Board of Trustees on August 27, 2014; (3) in her Nursing 238 class on August 28, 2014; (4) in her meeting with Graham on that same day; and (4) in her meeting with Graham and Baker on September 3, 2014. (Compl. ¶¶ 11, 14, 16, 17, 19.) Most of these occasions were plainly non-disruptive: three were outside of class in personal conversations or meetings scheduled to discuss Deegan's concerns, and one was a written communication to the Board of Trustees. Although Deegan spoke during a Nursing 238 class as well, she alleges that the statements were not disruptive and that she spoke in context of a larger in-class discussion about the quality of the nursing program. (*Id.* ¶ 16.) The fact that she was cleared of the misconduct charge based on that speech further supports the conclusion that her speech was appropriate. (*Id.* ¶ 25.) Taken in the light most favorable to Deegan, these allegations do not establish that she spoke at times and in places not intended for speech.

In short, defendants' argument that Deegan's speech violated a neutral rule against classroom disruption disregards Deegan's allegations and theory that defendants concocted a sham disciplinary charge in order to punish her for criticizing the nursing program. Defendants

---

[2] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). In that case, the Court held that schools could not impose content restrictions on student speech without evidence that doing so was "necessary to avoid material and substantial interference with schoolwork or discipline." *Id.* at 511.

simply ask the court to accept their version of events, which the court may not do at this stage.[3]

*See, e.g.*, *Davis v. Reg'l Acceptance Corp.*, 300 F. Supp. 2d 377, 382 (E.D. Va. 2002) ("[C]ompeting versions of the facts are the very basis for lawsuits and are therefore an insufficient basis for resolution on a motion to dismiss under Fed. R. Civ. P. 12(b)(6).") (report and recommendation by U.S. magistrate judge), *adopted by* 300 F. Supp. 2d 377. Accordingly, the court rejects defendants' argument that Deegan's speech was unprotected because it violated a rule against classroom disruption.

### 2. Adverse Effect

Next, defendants argue that Deegan has not stated a viable retaliation claim because the alleged retaliatory act—filing the misconduct charge against her—did not adversely affect Deegan's speech. The second element of a First Amendment retaliation claim requires Deegan to "establish that the government responded to [her] protected activity with conduct or speech that would chill or adversely affect [her] protected activity." *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). "Not every restriction is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory." *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995). To be actionable, defendants' conduct must result in "something more than a 'de minimis inconvenience' to her exercise of First Amendment rights." *Constantine*, 411 F.3d at 500 (quoting *Wicomico Cty.*, 999 F.2d at 786 n.6). A defendant's retaliatory conduct is sufficiently chilling when the conduct "would likely deter 'a person of

---

[3] Defendants raise several other arguments throughout their briefs: (1) that Virginia's interest in maintaining orderly classrooms justified limiting Deegan's speech; (2) that the misconduct charge against Deegan would have issued regardless of her protected speech because she disrupted class; and (3) that Deegan's speech was unprotected under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) because it disrupted class. These arguments are duplicative of defendants' time, place, and manner argument and each relies on the same assumption that Deegan's speech was, in fact, disruptive. Because the court cannot conclude that Deegan's speech was disruptive, those arguments fail.

ordinary firmness' from the exercise of First Amendment rights." *Id.* This is "a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez Corp.*, 202 F.3d at 686.

Here, Deegan has plausibly alleged that defendants' retaliatory actions were sufficiently adverse to chill her protected speech. Deegan claims that defendants retaliated against her by filing a student misconduct charge that accused her of disrupting class and of verbal abuse. (Compl. ¶¶ 20, 32.) That charge exposed Deegan to the risk of sanctions and forced her to prepare for and defend herself in a student misconduct hearing. It is certainly plausible that this kind of disciplinary charge resulted in more than a de minimis inconvenience to Deegan. *See Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 809 (S.D. Ohio 2014) (finding that a student misconduct charge was sufficiently adverse to chill the speech of a person of ordinary firmness); *see also Booker v. S.C. Dep't of Corr.*, 583 F. App'x 43, 44 (4th Cir. 2014) (per curiam) (finding that a false disciplinary charge filed against a prisoner was sufficiently adverse). That is particularly so considering that the false charges were leveled against her by the administrators of the program and college from which she hoped to graduate. Accordingly, the court concludes that Deegan adequately alleged adverse action.

Defendants argue that the misconduct charge did not chill Deegan's speech because she filed a grievance reiterating her concerns about the program after the charge was filed. (*See* Compl. ¶ 22.) However, the dispositive question is whether the retaliatory activity would deter a person of ordinary firmness from speaking; not whether it did, in fact, deter Deegan. As the Fourth Circuit reasoned in *Constantine*:

> We reject the defendants' suggestion that this inquiry depends
> upon the actual effect of the retaliatory conduct on a particular

14

> plaintiff. We have never held that a plaintiff must prove that the allegedly retaliatory conduct caused her to cease First Amendment activity altogether. The cause of action targets conduct that tends to *chill* such activity, not just conduct that *freezes* it completely. Moreover, such a subjective standard would expose public officials to liability in some cases, but not in others, for the very same conduct, depending upon the plaintiff's will to fight. We believe that an objective standard better instructs public officials as to their obligations under the First Amendment.

*Constantine*, 411 F.3d at 500 (emphasis in original); *see Wicomico Cty.*, 999 F.2d at 786 n.6. Accordingly, that Deegan did not actually cease her protected activity in response to defendants' conduct, though "some evidence of the tendency of that conduct to chill First Amendment activity," is not fatal to her claim. *Constantine*, 411 F.3d at 500.

Defendants also argue that because Deegan was not found guilty of misconduct, the charge against her would not deter a person of ordinary firmness from speaking. In support of this proposition defendants rely on *Lee v. Prince William Cty. Sch. Bd.*, Nos. 05-1639 & 05-1640, 2007 U.S. App. LEXIS 1596 (4th Cir. Jan. 24, 2007) (per curiam), an unpublished Fourth Circuit opinion. In that case, the school board decided not to allow Lee's daughter to attend a high school (Woodbridge) outside of her district for her final year of high school, though she had attended that school for the previous three years. *Id.* at *2. Lee brought a First Amendment retaliation claim, alleging that the school board decided not to allow her daughter to attend Woodbridge to retaliate against Lee for appealing administrative and disciplinary decisions of the Woodbridge faculty. *Id.* at *2–3. The district court found that Lee's speech had not been adversely affected because she had availed herself of the appeals process and procured her daughter's admission to Woodbridge, and the Fourth Circuit affirmed, without analysis, "substantially on the reasoning of the district court." *Id.* at *4.

15

Even if *Lee* were published, the court's analysis is simply too brief to be persuasive on this issue. Absent information about the nature of Lee's arrangement with the school board, the school board's process for reaching its decision, or the appeal process, the court cannot conclude that the school board's decision was comparable to the misconduct charge here. Nor does the *Lee* court's one-sentence summary of the district court's conclusion suggest that a misconduct charge of which a student is ultimately cleared can never be the basis for a retaliation claim. *See Booker*, 583 F. App'x at 44 (holding that a false disciplinary charge was sufficient adverse action although plaintiff was ultimately cleared of the charge). Accordingly, *Lee* does not compel a different conclusion here.

### 3. Causation

In her separately-filed motion, Moore argues that Deegan's claim against her must fail because Deegan has not established causation. Deegan "must allege a causal connection between her First Amendment activity and the alleged adverse action" in order to survive a motion to dismiss. *Constantine*, 411 F.3d at 501; *Suarez Corp.*, 202 F.3d at 686. "In order to establish [a] causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." *Constantine*, 411 F.3d at 501. Moore argues that Deegan has not adequately pleaded a causal connection because she has not shown that Moore was aware of her protected speech.

Here, the sparse allegations with respect to Moore are insufficient to establish that she was aware of Deegan's criticism of the nursing program. Deegan alleges that Moore (1) criticized the quality of the program and administered "pop quizzes;" (2) declined to discuss licensure scores with another student during class; and (3) was scheduled to attend a meeting with Deegan on September 3, 2014, but did not attend. (Compl. ¶¶ 13, 18, 19.) Although

Deegan alleges that she "discussed [her] concerns with the remaining instructors of the nursing program" at some point after she became concerned about the quality of the program in the spring of 2014, she does not identify a conversation with Moore. Accordingly, the court concludes that Deegan has failed to allege causation with respect to Moore, and the claim against her must be dismissed.[4]

### D. Qualified Immunity

Having determined that Deegan has plausibly stated a First Amendment retaliation claim against defendants Graham and Baker, the court turns to defendants' claim that they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *accord Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The qualified immunity analysis involves two questions: first, whether the defendants' actions as alleged violate a constitutional right; and second, whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232.

In determining whether a right is clearly established, courts must consider the right at issue with particularity. *Anderson*, 483 U.S. at 640; *Edwards v. City of Goldsboro*, 178 F.3d 231, 250-51 (4th Cir. 1999). "To be clearly established, a right must be sufficiently clear that every "reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (alterations in original) (internal quotations

---

[4] Deegan argues that in *Constantine*, 411 F.3d at 478, allegations that the plaintiff complained to "other law school officials" were sufficient to state claims against two associate deans in that case. However, the quoted language comes from the court's recitation of the facts, not the plaintiff's allegations, and whether that language was sufficient to establish that specific administrators had notice of the speech was not before the court. *Id.* at 501.

17

omitted); *see Anderson*, 483 U.S. at 640. "In other words, 'the existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle*, 132 S. Ct. at 2093 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."). "This is not to say that an official action is not protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. 640 (citations omitted).

Defendants seek qualified immunity on three grounds. First, they argue that qualified immunity is proper because it is not clearly established that a college cannot enforce rules against class disruption. Second, they argue that it is not clearly established that the content of Deegan's speech touched upon a matter of public concern. Finally, defendants argue that it is not clearly established that the misconduct charge of which Deegan was ultimately absolved was sufficient to chill her speech. The court finds these arguments unpersuasive.

Although defendants' first argument correctly states the law, it disregards Deegan's allegations and theory of the case. It is, in fact, well established that colleges can enforce neutral time, place, and manner regulations. *See Papish*, 410 U.S. at 670; *Healy*, 408 U.S. at 192–93; *Glover v. Cole*, 762 F.2d 1197, 1202 (4th Cir. 1985). But to grant qualified immunity on that ground would presuppose the truth of defendants' version of events. Deegan claims that she did not disrupt class, and that defendants accused her of misconduct to retaliate against her for criticizing the nursing program. That such conduct violates Deegan's First Amendment rights is similarly clear. *See Papish*, 410 U.S. at 670; *Constantine*, 411 F.3d at 499–501; *see also Thompson*, 990 F. Supp. 2d at 812 (denying qualified immunity for university administrators

18

who fabricated misconduct charges to retaliate against plaintiff for claims of race discrimination). If defendants can show that Deegan was in fact charged for violating such a regulation, they may be entitled judgment whether or not based on qualified immunity. But the court cannot conclude, taking the allegations of Deegan's complaint in her favor, that this was the case.

To the extent that the public or private nature of Deegan's speech is relevant here at all, *Qvyjt v. Lin*, 953 F. Supp. 244, 249 (N.D. Ill. 1997) (finding it "clearly established by no later than 1973, when the Supreme Court decided *Papish*, that state university official cannot retaliate or punish a graduate student for the content of his speech, regardless of whether that speech touches matters of public or private concern"), Deegan is only required to plausibly plead that the speech involved matters of public concern, which she has done. Following discovery, the court will know exactly what concerns Deegan discussed in her letter to the Board of Trustees and in her meetings with various VWCC instructors and administrators. The court will then have information about the content, form, and context of Deegan's speech. *See Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (noting that courts must determine whether speech related to matters of public concern by examining the "content, context, and form of the speech at issue in light of the entire record") (citing *Connick*, 461 U.S. at 147–48); *accord Snyder*, 562 U.S. at 453. The court can then determine, if necessary, whether defendants could reasonably believe Deegan's speech did or did not touch issues of public concern at the appropriate level of particularity. *See Anderson*, 483 U.S. at 640. So, in these particular circumstances, while qualified immunity may be appropriate after discovery, it is not appropriate now.

Finally, the court rejects defendants' argument that it is not clearly established that a misconduct charge for which no sanctions were ever issued is sufficiently adverse. Qualified

immunity is judged from the defendants' point of view at the time of the challenged conduct—in this case, when defendants filed the charge. *E.g.*, *DiMeglio*, 45 F.3d at 798. When defendants filed the misconduct charge, they ostensibly did not know that Deegan would be cleared of that charge. That Deegan was later exonerated therefore has no bearing on whether defendants knew, at the time they caused the charge to be filed, whether it would tend to chill her protected speech. *See Scott v. Churchill*, 377 F.3d 565, 570–71 (6th Cir. 2004) (rejecting a similar argument).

Again, Deegan's allegations are sufficient at this stage. A reasonable college official would know that a sham misconduct charge in retaliation for the exercise of First Amendment rights could tend to chill the speech of a person of ordinary firmness. Accordingly, the court will deny qualified immunity.[5]

### III. CONCLUSION

For the foregoing reasons, the court will grant Moore's motion to dismiss and deny Graham and Baker's motion to dismiss. An appropriate order will be entered.

Entered: March 30, 2017.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge

---

[5] If appropriate, defendants may seek qualified immunity later in motions for summary judgment.

20